**Valerie D. SMITH, Plaintiff–Appellant,**

v.

**The CASH STORE MANAGEMENT, INC.; The Cash Store, Ltd.; Harold L. Ahlberg; Trevor L. Ahlberg; and John Does 1–10, Defendants–Appellees.**

No. 99–2472.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1999.

Decided Oct. 27, 1999.

---

Daniel A. Edelman (argued), Edelman, Combs & Latturner, Chicago, IL, for Plaintiff–Appellant.

Paul J. Morency, Schiff, Hardin & Waite, Chicago, IL, for Defendants–Appellees Cash Store Management, Inc., Harold L. Ahlberg, John Does 1–10.

Paul E. Greenwalt, III (argued), Schiff, Hardin & Waite, Chicago, IL, for Defendant–Appellee Cash Store, Ltd., Trevor L. Ahlberg.

Before FLAUM, MANION, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

Valerie Smith sued The Cash Store, Ltd.; The Cash Store Management, Inc.; and The Cash Store Management, Inc.'s officers and directors (collectively "Cash Store") on behalf of a putative class for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and Illinois state contract law and consumer fraud statutes. This is an appeal from the district court's dismissal of Smith's suit for failure to state a claim under TILA. For the reasons set forth below, we affirm in part and reverse in part.

## Background

Cash Store operates at least sixteen loan establishments in Illinois. These establishments specialize in making short-term, high interest "payday loans," typically two weeks in duration and carrying annual percentage rates greater than 500%. When a Cash Store customer is granted a loan, the customer writes out a check, post-dated to the end of the loan period, for the full amount that he is obligated to pay. At the end of the two week period, the customer has the option of continuing the loan for an additional two week period by paying the interest.

Between June 13, 1998 and September 19, 1998, Smith obtained eight such loans from Cash Store. On each occasion she signed a standard "Consumer Loan Agreement" form. Each loan agreement stated an annual interest rate of 521%. Each loan agreement also contained the statement: "Security. Your post-dated check is security for this loan." Upon entering into or renewing each loan, Cash Store stapled to the top of the loan agreement a receipt which labeled the finance charge in red ink as either a "deferred deposit extension fee" or a "deferred deposit check fee," depending on whether the transaction was a renewal or an original loan.

The details of the loan agreement are important because the content and presentation of such agreements are regulated under TILA, 15 U.S.C. § 1601 *et seq.*, and implementing Federal Reserve Board Regulation Z ("Regulation Z"), 12 C.F.R. § 226. Congress enacted TILA to ensure that consumers receive accurate information from creditors in a precise, uniform manner that allows consumers to compare the cost of credit from various lenders. 15 U.S.C. § 1601; *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 220, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981). Regulation Z mandates that: "The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the [required] disclosures...." 12 C.F.R. § 226.17(a)(1). The mandatory

disclosures, which must be grouped in a federal disclosure section of a written loan agreement, include, among other things, the finance charge, the annual percentage rate, and any security interests that the lender takes. 12 C.F.R. § 226.18.

On March 16, 1999, Smith filed a class action complaint, amended on April 6, 1999, against Cash Store in the United States District Court for the Northern District of Illinois. She sued on behalf of a putative class for violations of TILA, for relief from an unconscionable loan contract, and for violations of the Illinois Consumer Fraud Act. The district court dismissed with prejudice the TILA claims for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), and then exercised its discretion to dismiss without prejudice the remaining supplemental state claims, as permitted by 28 U.S.C. § 1367(c)(3).

## Discussion

Smith argues on appeal that two of Cash Store's practices violate TILA, and that the district court's dismissal of the claims was therefore erroneous. The first practice relates to the receipts that Cash Store routinely stapled to the top of Smith's loan agreements. Smith contends that the receipts physically obscured the required federal disclosures and that they characterized the finance charges in a misleading way. The second practice relates to the security interest disclosures, which Smith contends were inaccurate. We address each of these allegations in turn.

### The Receipt Claim

TILA requires that a creditor make the required disclosures "clearly and conspicuously in writing...." 12 C.F.R. § 226.17. Smith alleges that the cash register receipt that Cash Store stapled to the upper left-hand corner of the loan agreements physically covered up some of the required disclosures. Furthermore, on her receipts were printed, in red, the terms "deferred deposit extension fee" or "deferred deposit check fee," whereas the term "finance charge" is used in the federal disclosure box. Smith argues that both of these practices render the required disclosures on the loan agreement neither "clear" nor "conspicuous."

The district court dismissed the claim relating to the Cash Store receipt on the ground that the allegations did not state a cause of action. It held that neither Cash Store's stapling of a receipt to the loan documents nor the printed contents of the receipt violated TILA, having found that "Cash Store's practice of stapling a small receipt to its TILA disclosures could not reasonably confuse or mislead Smith as to the terms of the loan." *Smith v. Cash Store Mgmt., Inc.*, No. 99 C 1726, 1999 WL 412447, at *3 (N.D.Ill. June 8, 1999).

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts to support his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Caremark*, 113 F.3d at 648 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). As we recently stated, "Rule 12(b)(6) should be employed only when the complaint does not present a legal claim." *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1059 (7th Cir.1999). Because the district court may not dismiss the complaint under Rule 12(b)(6) unless it is legally insufficient, we review that decision *de novo*. *Caremark*, 113 F.3d at 648.

As noted above, Regulation Z requires that "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously." 12 C.F.R § 226.17. The "sufficiency of TILA-mandated disclosures is to be viewed from the standpoint of an ordinary consumer, not the perspective of

a Federal Reserve Board member, federal judge, or English professor." *Cemail v. Viking Dodge*, 982 F.Supp. 1296, 1302 (N.D.Ill.1997).

Whether or not Cash Store's practices run afoul of Regulation Z is a factual issue, and the district court therefore erred in dismissing the receipt claims under Rule 12(b)(6). In her amended complaint, Smith contends that the stapled receipt contradicted and obfuscated the required disclosures. Am. Compl., ¶ 19. Her claim may fail on the facts, "but assessing factual support for a suit is not the office of Rule 12(b)(6)." *Johnson*, 169 F.3d at 1059. Although our holding does not preclude Cash Store from arguing, at the summary judgment stage, that Smith cannot prove her claims, Smith's complaint alleging that the stapled receipt obscured the disclosures and that the printed contents of the receipt were confusing or misleading states a valid legal claim under TILA, and that is sufficient to pass Rule 12(b)(6) scrutiny.

### The Security Interest Claim

Smith also contends that the district court erred in holding that Cash Store's statement, "Your post-dated check is security for this loan," was a lawful disclosure under TILA. TILA requires creditors to disclose accurately any security interest taken by the lender and to describe accurately the property in which the interest is taken. 15 U.S.C. § 1638; 12 C.F.R. § 226.18. Regulation Z defines "security interest" as "an interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law." 12 C.F.R. § 226.2(a)(25). Smith contends that Cash Store's statement in the loan agreement violates TILA

because, under Illinois law, the check does not serve as security.

■■■ Subject to narrow exceptions, "hypertechnicality reigns" in the application of TILA. *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995). Regulation Z specifies that certain federal disclosures must be grouped together in the loan agreement and also directs that the agreement "not contain any information not directly related to the [required] disclosures." 12 C.F.R. § 226.17(a)(1). In *Bizier v. Globe Financial Services Inc.*, the First Circuit explained that overinclusive security interest disclosures "cannot be dismissed as de minimis or hypertechnical." Overinclusive disclosures might deter a borrower's "future borrowing or property acquisition out of an exaggerated belief in the security interest to which they would be subject, or [give] a lender an apparent right which, even if ultimately unenforceable, could serve as a significant bargaining lever in any future negotiations concerning rights or obligations under the loan." 654 F.2d 1, 3 (1st Cir.1981); *see also Tinsman v. Moline Beneficial Fin. Co.*, 531 F.2d 815, 818–19 (7th Cir.1976) (holding that an overbroad disclosure of security interests violated TILA).[1] All TILA disclosures must be accurate, *Gibson v. Bob Watson Chevrolet–Geo, Inc.*, 112 F.3d 283, 285 (7th Cir.1997), and lenders are generally strictly liable under TILA for inaccuracies, even absent a showing that the inaccuracies are misleading, *Brown v. Marquette Savings and Loan Assoc.*, 686 F.2d 608, 614 (7th Cir.1982). Smith contends that if the check that Smith handed over upon agreeing to the loan does not give Cash Store a security interest, then its statement to that effect violates TILA.

1. The Federal Reserve Board's Official Staff Commentary to Regulation Z does, however, state that a lender is permitted to err on the side of inclusion in some circumstances: "If the creditor is unsure whether a particular interest is a security interest under applicable law (for example, if statutes and case law are either silent or inconclusive on the issue), the creditor may at its option consider such interests as security interests for Truth in Lending purposes." 12 C.F.R. Pt. 226, Supp. I, § 226.2(a)(25)(1). We need not resolve whether these circumstances apply to this dispute.

Cash Store first responds that the check acts as "security" because it gives Cash Store alternate routes to collect its debt. The check might facilitate payment because the loan agreement provides that Cash Store may deposit it on the loan due date if another form of payment is not made. If the check were to bounce, Cash Store could sue Smith under Illinois "bad check" statutes. According to Cash Store, the check then "secures" the loan by making repayment easier or by placing Cash Store in a stronger litigating position under Illinois law if Smith does not pay back the loan. Hence, the statement "Security: Your post-dated check is security for this loan" is accurate, and perhaps even required under TILA.

This argument, standing alone, is incomplete because it confuses "security" with "security interest." True, Cash Store may be in a better position with the check than without it, and in that sense it may regard its loan as more "secure." But this is a broader sense of "security" than that contemplated by Regulation Z. The regulations define "security interest"—which is a term of art referring to a specific class of transactions—as "an interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law." 12 C.F.R. § 226.2(a)(25). Illinois commercial law, in turn, defines it as "an interest in personal property ... which secures payment or performance of an obligation." 810 ILCS 5/1–201(37). By creating a security interest through a security agreement, a debtor provides that a creditor may, upon default, take or sell the property—or collateral—to satisfy the obligation for which the security interest is given. 810 ILCS 5/9–105(1)(c) (" 'Collateral' means the property subject to a security interest, and includes accounts and chattel paper which have been sold"). Because TILA restricts what information a lender can include in its federal disclosures, the question before us is not simply whether the post-dated check makes repayment more likely ("security") but whether it can meet the statutory re-quirements of "collateral" ("security *interest*").

Cash Store also maintains that Article 9 of the Illinois Uniform Commercial Code ("Illinois U.C.C."), which governs secured transactions, applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property ... including ... instruments." 810 ILCS 5/9–102(1)(a). Because the check is an instrument, it can be used to create a security interest by the terms of the Illinois U.C.C. *See In re Brigance*, 234 B.R. 401, 404–05 (W.D.Tenn.1999) (holding that, under Tennessee's U.C.C., a borrower's personal check can serve as collateral in which a security interest ·can be obtained).

We again believe that this argument ·is incomplete. While Article 9 of the Illinois U.C.C. generally authorizes the use of instruments as collateral to secure a loan, it is not immediately clear whether this provision applies to a post-dated check issued by the *borrower*.

Neither the ease of recovery in the event of default nor· the simple fact that a check is an instrument are sufficient to create a security interest. It is the economic substance of the transaction that determines whether the check serves as collateral. *Cf. Cobb v. Monarch Finance Corp.*, 913 F.Supp. 1164, 1177–78 (N.D.Ill. 1995) (distinguishing between a mechanism set up to facilitate repayment of a loan and an interest that secures a loan in the event of default). Therefore, in turning to our resolution of whether Cash Store took a security interest, our analysis must focus on the economic substance of Smith's pledged check.

We begin with the premise that collateral must be of some value to secure a loan; it cannot simply be additional evidence of indebtedness. Prior to the U.C.C., courts had "uniformly" answered in the negative the question of whether "the pledge of an independent promise of the debtor to pay a sum of money can be made valid security

for a debt." *New York Trust Co. v. Palmer*, 101 F.2d 1, 4 (2d Cir.1939); *see also Union Nat'l Bank v. People's Savings & Trust Co.*, 28 F.2d 326, 328 (3d Cir.1928) ("The term 'collateral security' implies the transfer to a creditor of an interest in or a lien on property, or an obligation which furnishes a security in addition to the responsibility of the debtor. The execution and delivery by the debtor of additional unsecured evidence of his indebtedness does not constitute collateral security."). Although we recognize that the U.C.C. has liberalized the scope of secured transactions, *see* 810 ILCS 5/9–101, U.C.C. cmt., we will assume that, even after Illinois' adoption of the U.C.C., collateral must have some value beyond the promise to pay contained in a loan agreement itself. *Cf. City of Chicago v. Michigan Beach Housing Coop.*, 242 Ill.App.3d 636, 182 Ill.Dec. 343, 609 N.E.2d 877, 886 (Ill.App. Ct.1993) (holding that certain tax credits could not serve as collateral because they had "no independent value in and of themselves").

Smith argues that, having already promised contractually through the loan agreement to pay the amount printed on the check, the pledged check gives Cash Store no interest that it did not already have. The Illinois U.C.C. expressly provides that a check does not operate as an assignment of the bank account on which it is drawn. 810 ILCS 5/3–408. And the check itself has no intrinsic value beyond the minuscule value of a scrap of paper. According to Smith, then, the post-dated check does not secure the loan because it merely restates the promise to pay already contained in the loan agreement. *Hitner v. Diamond State Steel Co.*, 176 F. 384, 391– 92 (C.C.D.Del.1910) ("It hardly admits of discussion that the mere duplication or multiplication of a promise to pay or of an acknowledgment of liability to pay a certain sum representing the total real indebtedness to a creditor, whatever may be its effect in furnishing in certain exigencies alternative or cumulative evidence of the real demand, cannot constitute collateral security.").

Smith may be correct that a second promise to pay, identical to the first, would not serve as collateral to secure a loan, because the second promise is of no economic significance: in the event that the borrower defaults on the first promise, the second promise to pay provides nothing of economic value that the creditor could seize and apply towards repayment of the loan. In this case, however, the post-dated check is not merely a second, *identical* promise. It is, indeed, a promise to pay the same amount as the first, but it has value to the creditor in the event of default beyond the value of the first promise. That is because a holder of both the loan and the check has remedies available to him that a holder of only the loan agreement does not. For example, the holder of the check has available remedies created by the Illinois bad check statute, 810 ILCS 5/3–806, which mandates that if a check is not honored, the drawer shall be liable for interest and costs and expenses incurred in the collection of the amount of the check.

Smith's own statement that the check is of no intrinsic value is instructive: it is its extrinsic legal status and the legal rights and remedies granted the holder of the check, like the holder of a loan agreement, that give rise to its value. Upon default on the loan agreement, Cash Store would get use of the check, along with the rights that go with it. Cash Store could simply negotiate it to someone else. Cash Store could take it to the bank and present it for payment. If denied, Cash Store could pursue bad check litigation. Additional value is created through these rights because Cash Store need not renegotiate or litigate the loan agreement as its only avenue of recourse.

It is not important that, as Smith argues, by the time Cash Store gets use of the check it might be clear that Smith would not or could not make good on a promise for that amount. Cash Store's

likelihood of, for example, successfully pursuing bad check litigation goes to the issue of valuation of the check (one might roughly calculate it as its face value plus supplementary awards created by the bad check statute, discounted by the probability of successfully pressing the claim) not the issue of whether the check has *any* value beyond the promise contained in the original loan agreement. In the same way, there is the chance that Smith would call her bank and cancel the post-dated check before the loan's due date, but this potentiality, depending on how the loan agreement might affect her legal right to do so, goes to how much holding the check is worth, not whether it has any value at all. Some additional value is created by the bad check statute and other legal provisions governing instruments.

This is not to say that by putting up a check as collateral, a lender like Cash Store necessarily takes a security interest in the *amount* printed on the face of the instrument. Rather, the rights created by state commercial law can, and in this case do, create some value in the instrument. We are therefore satisfied that Cash Store could lawfully assert under TILA that Smith's post-dated check was security for the loan.

### Conclusion

For the reasons stated above, we AFFIRM the district court's dismissal of the security interest claim, and we REVERSE and REMAND the district court's dismissal of the receipt claim for further proceedings consistent with this opinion.

MANION, Circuit Judge, concurring in part and dissenting in part.

I certainly agree with the court regarding the security issue. The Cash Store did not violate the Truth in Lending Act by informing Smith that it was holding her post-dated check as security for her loan. While possessing a post-dated check does not create a "security interest" as that term is usually understood, possession of the check nevertheless provided the Cash Store with added security for the loan. Although the Cash Store was not obligated under TILA to inform Smith that it held this check as security, lenders that seek to provide more information than is necessary under TILA should not be penalized for following the spirit of the statute. Thus, this court correctly affirmed the district court on this, the most substantive issue before this court on appeal.

The court's decision to reverse the district court on Smith's "receipt" claim is a concern. It is important to note that there are two facets to this claim. Smith asserts that stapling a small receipt to "the top of the 'Consumer Loan Agreement'" violated TILA by (1) contradicting the TILA-mandated disclosures; and (2) obscuring the required disclosures. Complaint ¶ 19. Smith possibly stated a claim regarding the "obfuscation" assertion because there could be a fact question as to exactly where the receipt was stapled and what it specifically obscured. But on its face the receipt clearly does not "contradict" the finance charge and the annual percentage rate, and it should cause no confusion regarding the terms of the agreement itself.

With respect to Smith's contention that the receipt obscured the required disclosures, for starters it appears that no court has ever held that obstructing a borrower's immediate view of the TILA disclosures violates TILA. The text of the statute and the regulations interpreting the statute do not indicate that this constitutes a violation. This is literally a matter of first impression, on a claim that is weak at best. For that reason alone the district court's dismissal of this claim has merit. *See* 15 U.S.C. § 1638; 12 C.F.R. § 226.17(a)(1) & n. 37 ("The disclosures may include an acknowledgment of receipt...."). That aside, the documents attached to Smith's complaint include an 8½ × 11 inch disclosure form and a 4½ × 3 inch receipt that supposedly obstructed some of the mandated disclosures. Perhaps there is a plausible set of facts regarding the obstruction claim that could

require looking beyond the complaint to determine if Smith would be entitled to any relief. The complaint states that the receipt was stapled to the "top" of the agreement. The court's opinion refers to stapling to the "upper left-hand corner." The district court noted that the staple mark was on the upper left-hand corner of the receipt and the loan document itself had no marks. If "top" could mean "front" and if Smith could show that the receipt was consistently stapled in the middle of the page covering the boxes boldly labeled "Annual Percentage Rate" and "Finance Charge," perhaps she would have a claim. But if this relatively small receipt is routinely stapled to the upper left-hand corner with the lowest part barely covering one of the boxes and which could easily be lifted, there would not be any material obscuring of the TILA disclosures.[1] More importantly, even assuming that an unsophisticated borrower would not lift up the receipt to see the small portion of the loan agreement covered by the receipt, such a borrower would still be able to clearly see the portions of the loan agreement which specify the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, the security posted for the loan, the penalty for late payment, and a notice telling the borrower to examine the other side of the agreement for important information. Congress enacted TILA to ensure that consumers had access to this information so that they could comparatively shop for loans. *See Walker v. Wallace Auto Sales, Inc.,* 155 F.3d 927, 930 (7th Cir.1998) (citing *Brown v. Marquette Sav. & Loan Ass'n,* 686 F.2d 608, 612 (7th Cir.1982) (Congress enacted TILA to "provide information to facilitate comparative credit shopping and thereby the informed use of credit by consumers.")). So by clearly communicating these terms, the Cash Store complied with the Act. The two pieces of information that the receipt would obstruct (if stapled to the upper left-hand corner), the lender's name and the borrower's own name, are not material to comparing interest rates and the like (and the names were printed on the receipt anyway). Accordingly, unless the Cash Store attached the small receipt to the middle of the loan agreement, implicitly to purposely obstruct and prevent an easy review of this information, there is no violation of TILA's requirements that the mandated disclosures be clear and conspicuous, and plaintiff fails to state a claim under the Act.

Smith also contends that the contents of the receipt contradicted the TILA-mandated disclosures. An obvious contradiction of a material term would constitute a violation of TILA. *See Rodash v. AIB Mortgage Co.,* 16 F.3d 1142, 1146 (11th Cir. 1994). Thus, when a lender informs a borrower of his right to rescind, but also contradicts this notice by telling the borrower that he had waived his right to rescind, the borrower may state a claim under the Act. *Id.* But Smith has not made such an assertion here. In assessing a complaint under Rule 12(b)(6) we again look at the exhibits attached to the complaint, and the receipts attached to Smith's complaint on their face do not contradict the disclosures in the loan agreement. The receipts here contain the amount borrowed on the same line as the words or word fragments: "DEFERRED CHECKS" or "DEFERRED DEPOSIT EXTENSI." As there are no assertions made in the receipt, these words in no way contradict the information contained in the loan agreement. Furthermore, as the district court stated:

> The receipt is an insignificant and unofficial-looking document in comparison

---

1. Although Smith alleges that the receipt obstructed the disclosures, the size of the exhibits indicates otherwise. Where exhibits contradict the allegations in a complaint to which they are attached, the exhibits trump the allegations. *Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998). This allows courts to avoid unnecessary proceedings when an undisputed fact establishes that the plaintiff cannot satisfy the 12(b)(6) standard. *See General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir.1997).

with the attached loan document. The "deferred deposit check fee" is a single, small entry on the receipt. The loan agreement, on the other hand, disclosed the finance charge and interest rate in large, boldface type in a conspicuous position on the front of the loan document. Even an unsophisticated borrower, receiving the two documents together, could not be confused as to the terms of the loan.

Perhaps the 500% interest rate is an "unconscionable" exploitation of the needs of the unsophisticated consumer as Smith's claim under state law asserts. As with the purchase of lottery tickets or cigarettes, consumers of payday loans likely know a bad deal when they see it but ignore the risks and take the loan anyway. A new state or federal law could eliminate these loans regardless of market demand. Until then TILA should not be stretched beyond its terms to restrict a product sophisticated consumers don't like. Because Smith's complaint and the exhibits attached thereto indicate that there was no contradiction (much less an obvious contradiction of a material term), she has failed to state a claim under TILA. Accordingly, the district court also correctly dismissed this part of the claim under Rule 12(b)(6).